Order Filed on September 9, 2026
by Clerk
U.S. Bankruptcy Court
District of New Jersey

**UNITED STATES BANKRUPTCY COURT**
**DISTRICT OF NEW JERSEY**

| | |
|---|---|
| In Re:<br><br>**NATIONAL REALTY INVESTMENT ADVISORS, LLC,**<br><br>Debtor. | Case No.: 22-14539<br>Chapter: 11<br>Judge: John K. Sherwood |
| **AIRN LIQUIDATION TRUST CO., LLC,**<br><br>Plaintiff,<br>v.<br>**BLOOMBERG L.P.,**<br>Defendant. | Adv. Pro. No.: 26-01163 |

**<u>DECISION RE: DEFENDANT'S MOTION TO DISMISS</u>**

The relief set forth on the following pages numbered two (2) through seventeen (17) is hereby **ORDERED.**

**DATED: September 9, 2026**

Honorable John K. Sherwood
United States Bankruptcy Court

## INTRODUCTION

In this adversary proceeding, the Plaintiff AIRN Liquidation Trust Co., LLC ("Plaintiff") seeks a judgement against Defendant Bloomberg L.P. ("Bloomberg") for its alleged role in a real estate Ponzi scheme carried out through the Debtors, National Realty Investment Advisors, LLC, and its affiliates ("NRIA").[1] [ECF No. 1]. Bloomberg performed marketing services for NRIA from June 2010 through 2021. [ECF No. 1, ¶ 11]. Bloomberg filed a Motion to Dismiss based on the primary argument that the Plaintiff's aiding and abetting claims should be dismissed for failing to adequately allege that Bloomberg had actual knowledge of the Ponzi scheme or Bloomberg substantially assisted the Ponzi scheme. Bloomberg also argues that the Plaintiff does not have standing to bring tort claims on creditors' behalf and the rest of the Plaintiff's claims should be dismissed on other grounds. [ECF No. 11].

The Plaintiff has filed numerous adversary proceedings against different defendants with similar allegations to this case. The Court incorporates much of the legal analysis from the following decisions: *AIRN Liquidation Trust Co., LLC v. Media Effective LLC, et. al.*, Case No. 22-14539, Adv. Pro. No. 23-01335, [ECF No. 91] ("Media Effective Decision"); *AIRN Liquidation Trust Co., LLC v. Wipfli LLP*, Case No. 22-14539, Adv. Pro. No. 24-01456, [ECF No. 19] ("Wipfli Decision"); *AIRN Liquidation Trust Co., LLC v. Bank of America, N.A.*, Case No. 22-14539, Adv. Pro. No. 25-01239, [ECF No. 22] ("BofA Decision"); *AIRN Liquidation Trust Co., LLC v. Valley National Bancorp d/b/a Valley National Bank*, Case No. 22-14539, Adv. Pro. No. 25-01237, [ECF No. 17] ("Valley Decision").

[1] Capitalized terms not otherwise defined herein have the same definitions as set forth in the Complaint.

## JURISDICTION

This Court has jurisdiction over this matter pursuant to 28 U.S.C. §§ 1334(b), 157(a), and the Standing Order of Reference from the United States District Court for the District of New Jersey. The Plaintiff alleges that this is a core proceeding citing to 28 U.S.C. § 157(b)(2). Bloomberg argues that this is a non-core proceeding and does not consent to the entry of final orders or judgment by the Bankruptcy Court. Fed. R. Bankr. P. 7008. To the extent this proceeding (or any part thereof) is ultimately deemed to be non-core, this Decision would constitute the Court's proposed findings of fact and conclusions of law under 28 U.S.C. § 157(c)(1).

## FACTS AND PROCEDURAL HISTORY

The Complaint alleges that Thomas Nicholas Salzano, a/k/a Nick Salzano, Rey E. Grabato II, and other co-conspirators operated NRIA, a purported real estate development firm and fund manager, as a Ponzi scheme that promised Investors high rates of returns to solicit investments. By the time the Ponzi scheme collapsed, NRIA had raised approximately $664 million from almost 2,000 Investors. [ECF No. 1, ¶ 1]. NRIA filed for Chapter 11 relief on June 7, 2022. Its Amended Chapter 11 Plan was confirmed on August 10, 2023, and provided for the formation of a liquidation trust as a successor to NRIA's bankruptcy estate for the purposes of liquidating real estate assets and pursuing litigation. The litigation claims contributed to the trust under the Chapter 11 Plan included claims contributed by NRIA's Investors. [Case No. 22-14539, ECF No. 3599].

In 2010, Salzano entered into a business relationship with Bloomberg as an advertising platform to promote NRIA. [ECF No. 1, ¶¶ 3-4]. In exchange for publishing thousands of audio and video advertisements, NRIA transferred approximately $3,785,073.50 directly or indirectly to Bloomberg from June 2012 through 2021. [ECF No. 1, ¶¶ 5, 11]. These advertisements promised,

for example, "10% guaranteed returns monthly payouts and bonuses up to 16%" and instructed investors to "call now" because "[p]rime real estate goes fast." [ECF No. 1, ¶ 72]. As a result, approximately $40 million in investments were solicited from Bloomberg's advertisements. [ECF No. 1, ¶ 9]. Salzano indicated that NRIA used Bloomberg as a "BRANDING vehicle" due to Bloomberg's credibility as a source of financial information. [ECF No. 1, ¶¶ 59-60, Ex. C].

The allegations in this Complaint are very similar to the allegations in the Plaintiff's Complaints in the Media Effective, Bank of America, Valley, and Wipfli cases. The Complaint against Bloomberg contains ten (10) counts summarized below.

- Count I – Aiding and Abetting Fraud: Bloomberg provided substantial assistance by advertising and promoting NRIA's fraud and Bloomberg knew the advertisements contained falsities and omissions consistent with a Ponzi scheme.
- Count II – Aiding, Abetting, or Participation in Breach of Fiduciary Duty: As an investment advisor, NRIA owed a fiduciary duty to its Investors. Bloomberg knew that NRIA had a fiduciary duty yet knowingly aired NRIA advertisements that it knew to be false or misleading to Investors.
- Count III – Fraud: Bloomberg made misrepresentations to the public regarding NRIA and the Fund and the misrepresentations were material. Bloomberg made those material misrepresentations with knowledge or reckless disregard as to their falsity with the intent others would justifiably and reasonably rely upon the misrepresentations and invest in NRIA, and Investors suffered financial losses resulting in damages.
- Count IV – Actual Fraudulent Transfers under 11 U.S.C. §§ 548(a)(1)(A) and 544 and New Jersey Law: Bloomberg received marketing fees from NRIA in the total amount of approximately $3,785,073.50. In the two years preceding the bankruptcy, Bloomberg received marketing fees in the amount of approximately $603,044.25. In the four years preceding the bankruptcy, Bloomberg received marketing fees in the amount of approximately $1,345,573.50. These transfers were made with actual intent to hinder, delay, or defraud creditors because they were made in furtherance of the Ponzi scheme.
- Count V – Constructive Fraudulent Transfers: Bloomberg received marketing fees from NRIA in the total amount of approximately $3,785,073.50. In the two years preceding the bankruptcy, Bloomberg received marketing fees in the amount of approximately $603,044.25. In the four years preceding the bankruptcy, Bloomberg received marketing fees in the amount of approximately $1,345,573.50. NRIA did not receive reasonably

equivalent value from these transfers and was insolvent or became insolvent as a result, engaged or was about to engage in a business or transaction for which remaining property was an unreasonably small capital, and/or intended or believed it would incur debts beyond its ability to pay.

- Count VI – Aiding and Abetting Securities Fraud under New Jersey Law: As an agent of NRIA, Bloomberg materially participated in the fraudulent sale of securities to Investors.
- Count VII – Unjust Enrichment: Bloomberg received sums for its services, and the retention of these sums would be unjust.
- Count VIII – Constructive Trust: Bloomberg engaged in conduct that was fraudulent, unfair, and/or unconscionable and was directly and materially enriched by virtue of such conduct. Bloomberg received transfers by fraud and is the voluntary trustee of these transfers, as applicable, for the benefit of the Plaintiff.
- Count IX – Disallowance of All Claims: To the extent Bloomberg files a proof of claim, it should be disallowed.
- Count X – Equitable Subordination: To the extent Bloomberg files a proof of claim, it should be equitably subordinated.

[ECF No. 1].

In its Motion to Dismiss, Bloomberg makes the same primary argument as in the Bank of America and Valley cases: the Plaintiff fails to sufficiently plead the aiding and abetting claims. [ECF No. 11]. The Court heard oral arguments on the Motion to Dismiss on August 4, 2026. For the reasons set forth on the record on August 4, 2026, the Court found that the Plaintiff has standing to bring tort claims against Bloomberg, but Count VI (Aiding and Abetting Securities Fraud), Count VII (Unjust Enrichment), Count VIII (Constructive Trust), Count IX (Disallowance of All Claims), and Count X (Equitable Subordination) would be dismissed. The remaining claims, Count I (Aiding and Abetting Fraud), Count II (Aiding, Abetting, or Participation in Breach of Fiduciary Duty), Count III (Fraud), Count IV (Actual Fraudulent Transfers), and Count V (Constructive Fraudulent Transfers) are discussed herein.

## LEGAL STANDARD

Under Federal Rule of Civil Procedure 8(a)(2), a complaint must include "a short and plain statement of the claim showing that the pleader is entitled to relief." A complaint "does not need detailed factual allegations," but the plaintiff is obligated to show grounds for relief that are more than labels, conclusions, or elements of a claim. *Bell Atl. Corp. v. Twombly*, 550 U.S. 544, 555 (2007). Therefore, to survive a motion to dismiss under Rule 12(b)(6), a complaint requires "sufficient factual matter" that, when accepted as true, states a claim plausible on its face. *Ashcroft v. Iqbal*, 556 U.S. 662, 663 (2009). Factual plausibility exists when factual content "allows the court to draw the reasonable inference that the defendant is liable for the misconduct alleged." *Id.* at 678 (citing *Twombly*, 550 U.S. at 556, 570).

The court's task is context-specific, and if the court cannot infer from well-pleaded facts more than the possibility of misconduct, then the complaint has only alleged, but not shown, entitlement to relief. *Iqbal*, 556 U.S. at 679 (quoting Fed. R. Civ. P. 8(a)(2)). Federal Rule of Civil Procedure 12(b)(6) is made applicable in adversary proceedings pursuant to Federal Rule of Bankruptcy Procedure 7012(b) and governs a motion to dismiss. "In order to grant a 12(b)(6) motion to dismiss, the Court must find that [the plaintiff] will be unable to prevail even if [it proves] all of the allegations in the complaint, basing its decision solely on the legal sufficiency of the complaint." *Poling v. K. Hovnanian Enters.*, 99 F. Supp. 2d 502, 507 (D.N.J. 2000).

Additionally, Fed. R. Civ. P. 9(b) imposes a heightened pleading standard upon fraud claims, requiring a party to "state with particularity the circumstances constituting fraud." *See In re Burlington Coat Factory Sec. Litig.*, 114 F.3d 1410, 1424 (3d Cir. 1997) (holding that dismissal

under Rule 12(b)(6) alone may not be proper, but because of the fraud-claim particularity requirements, dismissal under Rule 9(b) may be granted).

## ANALYSIS

### I. Aiding and Abetting Fraud (Count I) and Aiding and Abetting Breach of Fiduciary Duty (Count II).

To establish aiding and abetting fraud in New Jersey, the Plaintiff must prove that (1) NRIA committed fraud which caused an injury at the time of the defendant's assistance; (2) the defendant was aware its role was "part of an overall illegal or tortious activity" when it provided the assistance; and (3) the defendant knowingly and substantially assisted in the fraud. This Court discussed the requirements of pleading aiding and abetting fraud and aiding and abetting breach of fiduciary duty in the BofA Decision. [BofA Decision, pp. 13-20 of 26].

The Complaint easily satisfies the first element of the aiding and abetting analysis because it describes NRIA's fraudulent conduct with detailed facts [ECF No. 1, ¶¶ 1-12, 24-48] and the underlying breach of fiduciary duty arose from NRIA's Ponzi scheme. [ECF No. 1, ¶¶ 124-32]. As to the knowledge requirement, the Plaintiff alleges:

- Bloomberg knowingly aired NRIA advertisements that contained the term "guaranteed" when discussing a minimum 10% return and upside return of 21%, despite this being a clear red flag. [ECF No. 1, ¶ 73].
- Bloomberg's own invoices for NIRA listed the advertisements as being for "guaranteed" returns. [ECF No. 1, ¶ 74].
- Bloomberg knew that Salzano and NRIA were using Bloomberg as a "branding vehicle" for NRIA, using Bloomberg's reputation to entice Investors. [ECF No. 1, ¶ 60]. The Complaint identifies Investors who first learned of NRIA through Bloomberg, viewed Bloomberg's association as a "stamp of approval," and invested substantial sums in reliance on the credibility Bloomberg's platform conferred. [ECF No. 1, ¶¶ 53-58].
- Bloomberg continually bowed to pressure tactics from Salzano when Bloomberg was advised by its in-house and outside counsel to question some of the claims being made in

the advertisements, yet elected to disregard that advice and to run the advertisements anyway. Salzano threatened to take his business elsewhere if Bloomberg did not acquiesce. [ECF No. 1, ¶¶ 85-92].

- Bloomberg ignored clear warnings – "red flags" – from Bloomberg's own in-house and outside counsel regarding investment return claims being made in the advertisements, as well as the failure to include certain disclosures, and ran the advertisements anyway. [ECF No. 1, ¶¶ 85-92].
- Bloomberg did not follow through on an inquiry made by [David Evans,] an investigative journalist tied to Bloomberg (a former government prosecutor who specialized in fraud, and who had previously published articles on some of the "red flags" of fraud)[,] regarding the guaranteed return claims being made in these advertisements. [ECF No. 1, ¶¶ 95-100]. [Mr.] Evans was provided with NRIA's PPM in August 2020, but the Liquidation Trustee is entitled to discover whether Bloomberg possessed this information at an even earlier date.
- Bloomberg was on direct notice, as early as 2010, of a Business Insider article that identified NRIA as a potential "scam." [ECF No. 1, ¶¶ 67-68].
- Bloomberg account representatives [such as Donna Russo and Marc Siegel] had a long history of socializing and soliciting Salzano and Grabato through dinners, tickets to sporting events, and regular attendance at holiday parties. [ECF No. 1, ¶¶ 76-77].
- Bloomberg knew Salzano was the control person at NRIA by virtue of these personal relationships and direct e-mail correspondence with Salzano demonstrating his final authority on NRIA scripts and script changes. [ECF No. 1, ¶¶ 76-77].
- Bloomberg reported directly on the NorVergence fraud involving Salzano in 2010. [ECF No. 1, ¶¶ 62-63].

[ECF No. 13, pp. 56-57 of 77].

Bloomberg argues that red flags, news reports, knowledge of Salzano as a "control person," "pushback" from NRIA, and "other conclusory allegations" are not sufficient to allege knowledge of NRIA's fraud or breach of fiduciary duty. [ECF No. 11-1, pp. 17-27 of 49]. Specifically, Bloomberg cites to *In re Agape Litig.*, 773 F. Supp. 2d 298 (E.D.N.Y. 2011) for several propositions: (i) "alleged ignorance of obvious warning signs of fraud will not suffice to adequately allege actual knowledge" (*id.* at 310) (citation omitted); (ii) allegations that the

defendant is incentivized to participate in the fraud because it will benefit if the fraudulent enterprise succeeds is a motive that is "generalized and could be imputed to any for-profit endeavor" (*id.* at 312) (citation omitted); (iii) "knowledge of [a fraudster's] previous fraud conviction do[es] not constitute actual knowledge of a fraud perpetrated years later merely because [the fraudster] was involved" (*id.*) (citation omitted); (iv) "[d]efendants cannot be charged with knowledge of . . . misconduct simply because they have knowledge of accusations" (*id.*) (citation omitted); (v) "actual knowledge [is not inferred] based on a close relationship between . . . [an] employee and the perpetrator of the scheme." *Id.* at 313-14 (citations omitted).[2]

*Agape* shares similar facts to the present case. However, another case in the Second Circuit, *Vasquez v. Hong Kong and Shanghai Banking Corp.*, shares more similarities. No. 18 Civ. 1876 (PAE), 2019 WL 2327810 (S.D.N.Y. May 30, 2019). *Vasquez* distinguishes *Agape* and found that an additional allegation that put the defendant on actual notice of the fraud was sufficient for aiding and abetting fraud at the motion to dismiss stage. In *Vasquez*, allegations that the defendant was on notice of a risk of fraudulent activity, the defendant conducted a manual review of a suspicious wire transfer and requested additional information, and the defendant did not conduct a site visit of the business "viewed in isolation, fall far short of pleading actual knowledge." *Id.* at *16. But, the plaintiff's complaint alleged that the defendant did its own independent research on the

[2] Also, Bloomberg cites *DeFazio v. Wells Fargo Bank Nat'l Ass'n*, No. 20-375 (SRC), 2020 WL 1888252, at *5 (D.N.J. Apr. 16, 2020) for the proposition that the actual knowledge standard was applied to an aiding and abetting claim in New Jersey. [ECF No. 11-1, p. 18 of 49]. *DeFazio* relies on *State, Dep't of Treasury, Div. of Inv. ex rel. McCormac v. Qwest Commc'ns Int'l*, 387 N.J. Super. 469, 483 (App. Div. 2006) for the knowledge standard. In *Qwest*, the New Jersey Superior Court found that a plaintiff must show that the alleged aider-abettor was "generally aware of his role as part of an overall illegal or tortious activity at the time that he provides the assistance." *Id.* (citation omitted). The "general awareness" standard applied in *Qwest* and *DeFazio* is the same standard used by other courts in the Third Circuit.

fraudulent enterprise and upon review it "reasonably appeared" that the business was a Ponzi scheme. *Id.* at *17.

Here, the Plaintiff alleges that Bloomberg's legal team asked for information to substantiate the claims of a "10% cash flow and a return with bonuses from 18-21%." In response, Salzano pushed back, threatened to take his business elsewhere, and attached documentation. That same day (just hours later), Bloomberg approved NRIA's advertisements. Such a quick turnaround suggests that Bloomberg was provided with information that either demonstrated NRIA's fraud and breach of fiduciary duty or supported NRIA's guaranteed returns but chose not to give the documents close scrutiny. [ECF No. 1, Ex. K]. The Plaintiff would have to prove that it "reasonably appeared" to Bloomberg that NRIA was engaging in fraud and breach of fiduciary duty to demonstrate knowledge pursuant to the standard set forth by courts in the Second Circuit.[3]

But, the stricter Second Circuit law is merely persuasive, not binding, authority for this Court. As discussed in the BofA Decision, the Third Circuit in *Monsen v. Consol. Dressed Beef Co., Inc.* found that the plaintiff "must establish conscious involvement in impropriety or constructive notice of intended impropriety" which can be demonstrated by a showing that the

[3] The Second Circuit standard for knowledge is narrower than other circuits. *Agape* distinguishes Second Circuit law from Ninth Circuit law, stating that while certain "allegations may be sufficient to plausibly allege actual knowledge in the Ninth Circuit, absent more specific allegations, courts in [the Second Circuit] have been less willing to infer actual knowledge based on a close relationship between a bank employee and the perpetrator of the scheme." *In re Agape*, 773 F. Supp at 313 (contrasting *Benson v. JPMorgan Chase Bank, N.A.*, Nos. C-09-5272, C-09-5560, 2010 WL 1526394, at *4 (N.D. Cal. Apr. 15, 2010) (relying on "specific allegations and reasonable inference therefrom" to find actual knowledge of a Ponzi scheme)). The Ninth Circuit is not the only other circuit with a broader standard for knowledge than the Second Circuit. *See, e.g.*, *Woods v. Barnett Bank of Ft. Lauderdale*, 765 F.2d 1004, 1009 (11th Cir. 1985) ("In discussing the 'general awareness' element, the court noted that the surrounding circumstances and expectations of the parties were critical, because knowledge of the existence of a violation must usually be inferred.") (citation omitted); *El Camino Res. Ltd. v. Huntington Nat. Bank*, 712 F.3d 917, 922-23 (6th Cir. 2013) (using an actual knowledge standard that can be proven by direct or circumstantial evidence).

aider-abettor "had general awareness that his role was part of an overall activity that is improper." 579 F.2d 793, 799 (3d Cir. 1978) (citation omitted). Also, like in BofA, while the Plaintiff's allegations listed above may not rise to actual knowledge on their own, other allegations by the Plaintiff support a reasonable inference that Bloomberg may have had knowledge of NRIA's fraud. First, as already discussed, lawyers from Bloomberg sought additional information from Salzano to substantiate NRIA's claims of "guaranteed" returns. Additionally, the Business Insider article was sent directly to employees at Bloomberg and put Bloomberg on notice of NRIA's suspicious activity, even though it was publicly retracted. [ECF No. 1, ¶¶ 67-68]. And, David Evans, an investigative journalist tied to Bloomberg, scrutinized the promises in NRIA's advertisements. [ECF No. 1, ¶¶ 95-100].

Like in the BofA and Valley Decisions, taken as a whole, the above allegations by the Plaintiff support a reasonable inference that Bloomberg may have had knowledge of NRIA's fraud and breach of fiduciary duty. The Plaintiff will have to prove that Bloomberg learned that NRIA was engaged in fraudulent activities and breach of fiduciary duty and decided to turn a blind eye because of the benefits derived from NRIA's business. To meet this burden, the Plaintiff will have to find a credible NRIA or Bloomberg witness who will say that NRIA's fraudulent schemes were shared with Bloomberg. The Plaintiff does not have this evidence now, but it should have a reasonable opportunity to conduct limited discovery to see if anyone at Bloomberg was aware that NRIA was a Ponzi scheme.

Next, the Court must consider whether the pleadings provide enough information for the Court to infer that Bloomberg substantially assisted the fraud and breach of fiduciary duty. [BofA Decision, pp. 17-18 of 26]. The Plaintiff alleges that Bloomberg, a credible source of financial

information, aired advertisements that contained misleading and false information about NRIA and urged potential Investors to call NRIA immediately. [ECF No. 1, ¶¶ 9, 70]. Bloomberg argues that it only provided "routine advertising services by selling advertising slots to NRIA." [ECF No. 11-1, p. 27 of 49]. However, Bloomberg arguably engaged in services that were beyond "routine" if it knew that NRIA used it as a branding agent.[4]

The allegations of the Complaint, plus the fact that Bloomberg only produced 49 documents in response to the Official Committee of Unsecured Creditors' Rule 2004 Subpoena issued on or about August 22, 2023 [ECF No. 1, ¶¶ 102-05], are sufficient for the Plaintiff to proceed to discovery. Discovery should focus on the narrow issue of whether journalist David Evans, Bloomberg employees Donna Russo and Marc Siegel, or Bloomberg's legal counsel that reviewed the documents submitted by Salzano had knowledge of NRIA's fraud or breach of fiduciary duty. This can be accomplished through a focused set of documents and depositions. The Court urges the parties to concentrate on this issue and be mindful of the legal fees incurred. Accordingly, Counts I and II are not dismissed.

**II. Fraud (Count III).**

Under New Jersey law, the elements of a claim for common-law fraud are: "(1) a material misrepresentation of a presently existing or past fact; (2) knowledge or belief by the defendant of

[4] The Plaintiff recounts testimonials of several anonymous Investors. One Investor referenced as "Investor X" was a financial professional who first learned of NRIA through a Bloomberg radio advertisement. He felt "comfort" investing in NRIA because of Bloomberg's credibility and "assumed that Bloomberg did some vetting of NRIA before allowing it to air advertisements of the Ponzi scheme." Investor X ultimately invested $2,987,454.00. [ECF No. 1, ¶ 53]. These Investor examples, coupled with Bloomberg's alleged knowledge that NRIA used it as a branding agent, would support the Plaintiff's allegation that Bloomberg substantially assisted the fraud if the Plaintiff can prove that Bloomberg knew it was being used as a branding agent.

its falsity; (3) an intention that the other person rely on it; (4) reasonable reliance thereon by the other person; and (5) resulting damages." *Gennari v. Weichert Co. Realtors*, 148 N.J. 582, 610 (1997) (citation omitted).

Here, elements one, four, and five are easily met. It is undisputed that the advertisements aired by Bloomberg contained the material misrepresentations that NRIA was a legitimate investment and that Investors would receive guaranteed returns of 10% with target returns of 18-21%. [ECF No. 1, ¶¶ 69-74, Ex. B]. Also, the Plaintiff discussed Investor testimonials that demonstrate Investors reasonably relied on the statements in the advertisements. [ECF No. 1, ¶¶ 53-59]. These advertisements aired by Bloomberg resulted in approximately $40 million in damages. [ECF No. 1, ¶ 9].

For the second prong of the fraud claim, the Plaintiff alleges that Bloomberg had knowledge of NRIA's fraud, as set forth above. Bloomberg argues that the fraud claim should be dismissed because the Complaint does not adequately allege that Bloomberg had knowledge of the falsities in the advertisements. [ECF No. 11-1 p. 32 of 49]. But, as discussed above, the Plaintiff's allegations that Bloomberg knew that the advertisements contained false statements are sufficient for the Plaintiff to proceed to discovery.

Additionally, for the third element, the Plaintiff must show that Bloomberg intended Investors to rely on the false statements in the advertisements. The Plaintiff points out in its Opposition that Bloomberg had incentive for Investors to rely on the misrepresentations—if the Bloomberg advertisements successfully induced Investors, NRIA would continue its business with Bloomberg. [ECF No. 13, p. 68 of 77]. Bloomberg is correct that the Plaintiff did not allege more than a conclusory statement that Bloomberg intended Investors to rely on the misrepresentations.

The Court would be inclined to allow the Plaintiff to amend the Complaint after limited discovery to the extent it could prove this element.

Bloomberg, citing *Ideal Dairy Farms, Inc. v. John Labatt, Ltd.*, argues that the misstatements of material facts were made by NRIA rather than Bloomberg. 90 F.3d 737, 746 (3d Cir. 1996) ("Under New Jersey law, a plaintiff claiming fraud must prove that it detrimentally relied on an intentionally misleading statement *made by the defendant*.") (emphasis added). [ECF No. 11-1, pp. 32-34 of 49]. The Court agrees with Bloomberg on this point. There is no suggestion that this was anything more than an advertisement on the Bloomberg platform and that the statement was made by NRIA, not Bloomberg.

Based on the record here, at best the Plaintiff has an aiding and abetting fraud claim against Bloomberg. Though Bloomberg allowed the advertisements to be aired on its platform, Bloomberg never indicated that it was vouching for NRIA or the truthfulness of the statements. To the extent the Plaintiff can develop more facts to demonstrate that Bloomberg made the statements and deliberately intended for Investors to rely on them, the Plaintiff can move to amend the Complaint. Bloomberg's Motion to Dismiss is granted as to Count III.

**III. Actual Fraudulent Transfers (Count IV).**

The Court discussed actual fraudulent transfers under both the Bankruptcy Code and New Jersey law, and the Ponzi scheme presumption, in the BofA Decision [pp. 21-23 of 26] and the Media Effective Decision [pp. 27-31 of 39]. The Plaintiff here alleges that the fraudulent transfers from NRIA to Bloomberg include marketing fees in the total amount of approximately $3,785,073.50. In the two years preceding the bankruptcy, Bloomberg received marketing fees in the amount of approximately $603,044.25. In the four years preceding the bankruptcy, Bloomberg

received marketing fees in the amount of approximately $1,345,573.50. [ECF No. 1, Ex. A]. These transfers were made with actual intent to hinder, delay, or defraud creditors because they were made in furtherance of the Ponzi scheme. [ECF No. 1, ¶ 153].

Under § 548(c), a transferee can argue that it accepted the transfer for value and in good faith. *Image Masters, Inc. v. Chase Home Fin.*, 489 B.R. 375, 391 (E.D. Pa. 2013). This "good faith" defense is an affirmative one, and the defendant bears the burden of proof. *Id.* Bloomberg did not raise the § 548(c) good faith defense. Therefore, this defense will not be considered.

As in the BofA Decision, because the Plaintiff alleges that NRIA was conducting a Ponzi scheme, and the Plaintiff alleges that the fees paid to Bloomberg were in furtherance of the Ponzi scheme, the Ponzi scheme presumption applies. Accordingly, the Motion to Dismiss is denied as to Count IV.

**IV. Constructive Fraudulent Transfers (Count V).**

Transfers may be avoided if the Debtors received less than reasonably equivalent value in return for the transfer while the Debtors were insolvent. 11 U.S.C. 548(a)(1)(B); N.J.S.A. § 25:2-25(a)(2) and 25:2-27(a). The Complaint seeks to recover the transfers listed in Exhibit A, totaling $3,785,073.50. In the two years preceding the bankruptcy, Bloomberg received marketing fees in the amount of approximately $603,044.25. In the four years preceding the bankruptcy, Bloomberg received marketing fees in the amount of approximately $1,345,573.50. [ECF No. 1, Ex. A].

The Plaintiff argues that the transfers provided no value to NRIA from the perspective of NRIA's creditors because the advertisements did not produce *legitimate* revenue and just increased creditors' claims against NRIA. [ECF No. 13, pp. 71-72 of 77] (citing *In re Indep. Clearing House Co.*, 77 B.R. 843, 859 (D. Utah 1987) ("In fact, by helping the debtor perpetuate his scheme, the

transfers exacerbate the harm to creditors by increasing the amount of claims while diminishing the debtor's estate. In such a situation, the use of the defendant's money cannot objectively be called 'reasonably equivalent value.'"); *Warfield v. Byron*, 436 F.3d 551, 560 (5th Cir. 2006)).

Authorities are split on the issue of whether transfers from a fraudulent enterprise can ever be an exchange for reasonably equivalent value. Other courts have directly disagreed with *Indep. Clearing House* and found that "the proper focus of a fraudulent transfer inquiry is on the transfer itself, not the overall business practices of the Debtor." *In re Carrozzella & Richardson*, 286 B.R. 480, 490 (D. Conn. 2002). Courts in the Third Circuit have cited to *In re Carrozzella* for the proposition that "[s]imply because a debtor conducts its business fraudulently does not make every single payment by the debtor subject to avoidance." *Feldman as Tr. of Est. of Image Masters, Inc. v. SunTrust Bank*, No. 10-cv-1141, 2024 WL 4123779, at *10 (E.D. Pa. Sept. 6, 2024) (citing *In re Carrozzella & Richardson*, 286 B.R. at 489). Also, when determining reasonably equivalent value, the focus is not on the "general fraudulent nature of the debtor's Ponzi scheme" but rather the specific transaction. *In re Image Masters, Inc.*, 421 B.R. 164, 179 (Bankr. E.D. Pa. 2009) (citing *In re Carrozzella & Richardson*, 286 B.R. at 486-91); *see Image Masters, Inc. v. Chase Home Fin.*, 489 B.R. 375, 390 (E.D. Pa. 2013) (affirming the bankruptcy court's decision regarding the constructive fraud claims).

The Court is not persuaded by the Plaintiff's argument and will instead follow the other Third Circuit courts cited above. As to the specific transactions between NRIA and Bloomberg, there are no allegations that Bloomberg did not charge NRIA its standard marketing fees, thus these transfers were for reasonably equivalent value and were not constructive fraudulent transfers. Therefore, the Motion to Dismiss is granted as to Count V.

## CONCLUSION

Bloomberg's Motion to dismiss the Plaintiff's Complaint is granted as to Counts III, V, VI, VII, VIII, IX, and X, and is denied as to all other Counts. The Plaintiff's right to seek leave to amend the Complaint under Federal Rule of Civil Procedure 15(a)(2) is fully preserved. The Court reiterates that discovery should be limited to the issues identified herein with consideration of legal costs. If the Plaintiff cannot support its claims after conducting discovery, then the Plaintiff should withdraw them.